917 A.2d 1175

**Richard Jay MASSEY, Jr.**

v.

**STATE of Maryland.**

**No. 0546, Sept. Term, 2005.**

Court of Special Appeals of Maryland.

March 7, 2007.

David P. Kennedy (Nancy S. Forster, Public Defender, on brief), for appellant.

Gregory D'Alesandro (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel EYLER, JAMES R., SHARER, and WOODWARD, JJ.

SHARER, J.

Richard Jay Massey, Jr., appellant, was convicted of possession with intent to distribute a controlled dangerous substance (cocaine) and possession of cocaine, following a bench trial in the Circuit Court for Wicomico County.[1]

Massey moved for a new trial and to correct an illegal sentence. After these motions were denied, he noted this appeal, raising four questions, which we have recast and reordered:[2]

1. Whether the suppression court erred in denying Massey's motion to suppress.

---

1. Massey was sentenced on March 23, 2005, to ten years in prison for the possession with intent to distribute conviction. The possession count was merged.

2. In his brief to this Court, appellant asserts:
 I. THE TRIAL COURT IMPROPERLY RELIED ON EXCLUDED EVIDENCE IN FINDING MASSEY GUILTY OF POSSESSION WITH INTENT TO DISTRIBUTE.
 II. MASSEY'S JURY WAIVER WAS INVALID WHERE NOTHING IN THE RECORD SUPPORTED THE COURT'S DETERMINATION OF VOLUNTARINESS.
 III. THE TRIAL COURT ERRED IN PERMITTING SGT. BOND TO TESTIFY EVEN THOUGH HIS REPORT WAS NOT PROVIDED TO DEFENSE COUNSEL BEFORE CROSS–EXAMINATION AND WAS NEVER PRODUCED IN DISCOVERY, AND IN DENYING MASSEY'S MOTION FOR NEW TRIAL ON THIS GROUND.
 IV. THERE WAS NO PROBABLE CAUSE TO ARREST MASSEY.

2. Whether the trial court erred by not directing the State to provide the defense with a witness's report.

3. Whether the trial court erred by considering evidence outside of the record.

4. Whether the trial court erred in accepting Massey's jury trial waiver.

For the reasons that follow, we shall vacate Massey's convictions and remand for a new trial. We hold that the suppression court did not err in denying Massey's motion to suppress. We shall also hold, however, that the State was obligated to provide the defense with any report that was prepared by a police officer who testified as a State's witness, and that the trial court erred by not directing the State to disclose this report. We choose to discuss the remaining issues for guidance only.

## BACKGROUND

The charges against Massey arise from his arrest on June 18, 2004, for possession with intent to distribute cocaine and possession of cocaine. A criminal information formally charging Massey with these offenses was filed on September 24, 2004. Unsuccessful in pretrial motions to suppress evidence, Massey elected a bench trial and, as we have noted, was convicted.

We shall develop the facts as they relate, first, to the suppression issue and then to the evidentiary issues as they arose at trial.

### *1. Whether the suppression court erred in denying Massey's motion to suppress.*

### Standard of Review

In reviewing the court's disposition of a motion to suppress, "we look only to the record of the suppression hearing and do not consider the evidence admitted at trial." *In re Tariq A–R–Y,* 347 Md. 484, 488, 701 A.2d 691 (1997). In this limited review, we consider the evidence and reasonable

inferences drawn therefrom in the light most favorable to the prevailing party, in this instance the State. *Id.* We review the factual findings of the motions court for clear error. *Byndloss v. State*, 391 Md. 462, 477, 893 A.2d 1119 (2006). Although we defer to the hearing judge's findings of fact, we must make a *de novo* constitutional evaluation by "review[ing] independently the application of the law to those facts to determine if the evidence at issue was obtained in violation of the law[.]" *See Whiting v. State*, 389 Md. 334, 345, 885 A.2d 785 (2005).

## Suppression Evidence

A hearing on Massey's motion to suppress was conducted on January 21, 2005.[3] Detective Ronald Marzec of the Delmar Police Department, who for over seven years has been assigned to a narcotics enforcement task force operated by the Drug Enforcement Administration, was conducting an investigation of Room 123 at the Delmarva Inn and Convention Center in Delmar. As a result of this investigation, officers arrested Takoma Griffith at about 4:00 p.m. on June 18, 2004, and charged him with possession with intent to distribute crack cocaine.

During the course of his post-arrest interview with Griffith, Marzec learned that Massey "would deliver a quantity of crack cocaine to Room 123." With Marzec sitting next to him, Griffith telephoned Massey at about 4:30 p.m. Marzec could hear "partial voices" on the other end of the call as Griffith spoke, but he acknowledged that he did not know the identity of the person to whom Griffith was speaking. He also admitted that no details regarding any type of drug transaction were mentioned during the telephone conversation. Griffith said "I'm ready" and the other party responded "I'm on my way." Marzec described the telephone conversation:

> [P]rior to the telephone call being placed Mr. Griffith advised me that the logistics of the phone call would just basically ..., that Mr. Griffith would state that he was

---

**3.** The suppression motion and the merits trial were not heard by the same judge.

ready. And upon him saying that, Mr. Massey would go en route to Mr. Griffith's location to deliver the crack cocaine.

Griffith told Marzec that this was "the normal course of business between the two of them[,]" and that they had dealt that way at least several times in the past.

Marzec learned that Massey would be coming from the "Bridgeville, Coverdale area" of Delaware in either a Ford Explorer or by motorcycle. Marzec queried the Delaware Criminal Justice Information System computer and obtained a photograph of Massey and registration information about Massey's vehicles. The detective printed out the photograph and showed it to Griffith, who confirmed Massey's identity. Griffith said that Massey usually took one of two routes— southbound on Route 13 or the Old Stage Road. The trip was expected to take about 25 minutes.

As a part of the investigation, a "road unit" was positioned north of the state line in Delaware to look out for Massey. That "road unit" was Sergeant Michael Bond of the Delmar Police Department, who spotted Massey heading south on Route 13 and alerted Marzec. Bond told Marzec that he would attempt to follow the vehicle and "develop probable cause for a traffic stop at that location on the highway prior to Mr. Massey arriving." Bond was unable to justify a traffic stop, so he followed Massey while Massey first stopped for gas and then drove to the Delmarva Inn. Massey parked near Room 123, left the Explorer, and approached the door. Marzec looked out of the room's window and saw Massey arrive and get out of the Explorer. Armed with the photograph from the Delaware computer, Marzec confirmed Massey's identity. Marzec said also that Bond confirmed that the Explorer's tag number matched the registration to Massey's Explorer.

It was shortly after five o'clock when Massey knocked on the door to Room 123. He was greeted by Marzec and other officers, who took him into custody. The officers searched Massey incident to the arrest and recovered a plastic baggie with about "three and a half grams of crack cocaine." Bond

was assigned to search the Explorer and, within ten minutes, recovered another baggie "containing approximately two and a half grams of suspected crack cocaine."

In asserting that the evidence should have been suppressed, Massey contends that the information supplied by Griffith did not provide probable cause for his arrest. We disagree, and conclude that there was ample probable cause to arrest Massey as he appeared at the door to Room 123.

## DISCUSSION

The Fourth Amendment to the United States Constitution provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. CONST., amend. IV. "A warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause." *Maryland v. Pringle,* 540 U.S. 366, 370, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003). Put another way, "[t]he legality of a warrantless arrest is measured by the existence of probable cause at the time of the arrest." *Collins v. State,* 322 Md. 675, 678, 589 A.2d 479 (1991).[4]

"[T]he probable-cause standard is a ' "practical, non-technical conception" ' that deals with ' "the factual and practical considerations of everyday life on which reasonable

---

**4.** Md.Code Ann., Crim. Proc. § 2–202 (2001), governs warrantless arrests, and provides, in part:

**§ 2–202. Warrantless arrests—In general.**

\* \* \*

(c) *Probable cause to believe* felony *committed.*—A police officer without a warrant may arrest a person if the police officer has probable cause to believe that a felony has been committed or attempted and the person has committed or attempted to commit the felony whether or not in the presence or within the view of the police officer.

"This section is declarative of the Maryland common law governing warrantless arrests." *Collins v. State,* 322 Md. 675, 680, 589 A.2d 479 (1991).

and prudent men, not legal technicians, act." ' " *Pringle, supra,* 540 U.S. at 370, 124 S.Ct. 795 (quoting *Illinois v. Gates,* 462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (additional citations omitted)). Probable cause exists when the police possess reasonably trustworthy information, drawn from the totality of the facts and circumstances of each case, which supports the fair probability that contraband or evidence of a crime will be found in a particular place or that the suspect has committed a crime. *See Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *State v. Wallace,* 372 Md. 137, 147–48, 812 A.2d 291 (2002), *cert. denied,* 540 U.S. 1140, 124 S.Ct. 1036, 157 L.Ed.2d 951 (2004). "Probable cause does not demand the certainty we associate with formal trials." *Illinois v. Gates,* 462 U.S. at 246, 103 S.Ct. 2317.

 A law enforcement officer "may draw inferences based on his own experience in deciding whether probable cause exists." *Ornelas v. United States,* 517 U.S. 690, 700, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). "To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Pringle, supra,* 540 U.S. at 371, 124 S.Ct. 795 (quoting *Ornelas, supra,* 517 U.S. at 696, 116 S.Ct. 1657).

The issue before us, therefore, is whether the information supplied by Griffith to Marzec was sufficient to establish probable cause for Massey's arrest. Massey asserts that the suppression court clearly erred in concluding that the informant was "trustworthy" and takes issue with the motions court's rationale that the informant Griffith was known to the police and was motivated to cooperate.

 "In testing the sufficiency of probable cause for an officer's action even without a warrant, [the Supreme Court has] held that he may rely upon information received through an informant, rather than upon direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge." *Jones v. United*

*States,* 362 U.S. 257, 269, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), *overruled on other grounds, United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). The informant's reliability, veracity, and basis of knowledge are relevant factors in the probable cause determination. *State v. Lee,* 330 Md. 320, 327, 624 A.2d 492 (1993) (citing *Winters v. State,* 301 Md. 214, 227, 482 A.2d 886 (1984)). *See Illinois v. Gates, supra,* 462 U.S. at 230, 103 S.Ct. 2317 (factors are "closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is 'probable cause[.]' "). *See generally, West v. State,* 137 Md.App. 314, 328–33, 768 A.2d 150, *cert. denied,* 364 Md. 536, 774 A.2d 409 (2001).

Challenging the basis for police actions in this case, Massey relies primarily on *Dixon v. State,* 133 Md.App. 654, 758 A.2d 1063 (2000), in which this Court determined that a tip from a confidential informant did not provide police with probable cause. The informant's information in *Dixon* prompted the police to search the trunk of Dixon's car. The informant, who supposedly had provided police with information on prior occasions, called one officer to inform him that "a black male named Orville Dixon would be transporting approximately ten pounds of marijuana to the second level of a parking garage adjacent to the Nordstrom's department store at the Montgomery Mall." *Id.* at 659, 758 A.2d 1063. The informant also reported that Dixon would show up at about 8:15 p.m. in a dark-colored Acura and conduct a drug sale. *Id.* Relying upon that information, the police arrived at the parking garage and set up a surveillance. They saw the suspect car, and verified that it belonged to Dixon.

Dixon first emerged from the stairwell in the garage and started toward his car. He appeared to be looking for someone, but did not go to the car, but left the garage by the stairway. When Dixon, who was employed at the Nordstrom's store, appeared in the garage a second time, he went to his car and sat behind the wheel. Police officers converged on his car, blocked him in, and officers removed Dixon from the car and placed him in handcuffs. Although police saw nothing

incriminating inside the car's passenger compartment, an officer opened the trunk, without Dixon's consent and without a warrant, and discovered marijuana.

Dixon's motion to suppress the results of the search was denied by the circuit court. On appeal, this Court reversed. Posing the question as "whether the police had probable cause to search appellant's trunk[,]" we then concluded that the tip from the confidential informant did not justify the search of the trunk. *Id.* at 678, 758 A.2d 1063. Writing for this Court, Judge Hollander stressed that, in the case of a confidential informant, "evidence as to the informant's demonstrated reliability is also vital." *Id.* at 695, 758 A.2d 1063 (citing *Gates, supra,* 462 U.S. at 244 n. 13, 103 S.Ct. 2317). She explained:

> In this case, making our own constitutional review, as we are required to do, we conclude that the informant's tip did not provide probable cause to search the trunk. The content of the tip, standing alone, was inadequate to furnish "a reasonable assurance of being based on firsthand observation." ... Moreover, it was sorely lacking in meaningful detail. Nor did the police testify to any significant corroboration of the tip. Additionally, the record with respect to the confidential informant's reliability was woefully undeveloped....
>
> * * *
>
> Moreover, the kind of information provided by the tipster, such as appellant's place of employment and his schedule, could have been known to Dixon's co-workers, other persons employed at the Montgomery Mall, a garage attendant, personal acquaintances, or a party interested in making mischief. Therefore, the police did no more than corroborate innocuous information related by the informant. As we have seen, "the tip must provide something more than facts or details that are readily visible to the public."

*Dixon, supra,* 133 Md.App. at 695–97, 758 A.2d 1063 (citations omitted).

We believe *Dixon* is distinguishable. We are not persuaded by Massey's challenge to the motions court's finding that

Griffith was a known and trustworthy informant or his complaint about the court's explanation that Griffith was motivated to cooperate with the expectation of leniency.

■■■ Although Marzec did not explain that Griffith had provided information in the past, and thus had no "known" track record, Griffith clearly was not an "unknown" informant. " '[I]t is improper to discount [out of hand] an informant's information simply because he has no proven record of truthfulness or accuracy.' " *United States v. Canfield,* 212 F.3d 713, 719 (2d Cir.2000) (citation omitted). On the contrary, we believe the motions court could readily infer from the totality of the circumstances that Griffith, a target of a search and seizure warrant who had his own troubles with the police, was "known" because he had been identified and provided the information face-to-face. For example, in *United States v. Couch,* 367 F.3d 557, 560 (6th Cir.2004), the court, in rejecting the argument that police failed to show that the provider of information was a "reliable informant," observed that the informant's identity was known to police, had been named in the affidavit, and could be held accountable for lying to the police. *See Florida v. J. L.,* 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (known informant can be held responsible).

Again, Griffith was neither a confidential informant, nor an anonymous tipster. Nor was he an innocent civilian who was motivated by a civic purpose. He was caught red-handed after police executed a search and seizure warrant for his room, and, after being "interviewed" by the police, arranged to set up a drug buy from Massey. The fact that Griffith was interviewed "face to face" by Marzec strengthens the reliability of his information. *United States v. Greenburg,* 410 F.3d 63, 67 (1st Cir.2005). As noted by the Second Circuit:

> Here, the district court improperly discounted [the informer's] information. [The informer], who at the time was believed to be a participant in the crime at issue, gave the information to Customs Agents face-to-face after he was

apprehended with 142 pounds of marijuana, circumstances that ordinarily would suggest reliability.

*United States v. Gagnon,* 373 F.3d 230, 237 (2d Cir.2004) (footnote omitted) (citing cases). *See Cross v. State,* 165 Md.App. 164, 185–87, 884 A.2d 1236 (2005); *see also United States v. Christmas,* 222 F.3d 141, 144 (4th Cir.2000) (citing cases), *cert. denied,* 531 U.S. 1098, 121 S.Ct. 830, 148 L.Ed.2d 712 (2001). *Cf. West v. State, supra,* 137 Md.App. at 331, 768 A.2d 150 (no indication that informant had provided information for warrant face-to-face).

It is also reasonable to assume that Griffith would be motivated to cooperate. The following language is instructive:

> Even if favorable treatment had not been offered to him, [the informant] was presumably motivated to provide information after his arrest out of hope that his cooperating would result in more lenient treatment for himself by the authorities. He could not achieve that goal if he gave false information, so the circumstances in which he provided the information further served to corroborate its reliability.

*United States v. Patayan Soriano,* 361 F.3d 494, 505 (9th Cir.), *cert. denied,* 543 U.S. 852, 125 S.Ct. 266, 160 L.Ed.2d 86 (2004) (citing *United States v. Davis,* 617 F.2d 677, 693 (D.C.Cir.1979) (informant who lies to police risks disfavor with prosecution), *cert. denied,* 445 U.S. 967, 100 S.Ct. 1659, 64 L.Ed.2d 244 (1980)). Indeed, Griffith could have faced prosecution for lying to the police, in addition to the likely forfeiture of any "break" from the prosecution. *Herod v. State,* 311 Md. 288, 297, 534 A.2d 362 (1987). Judge Rodowsky also pointed out in *Herod* that the informant disclosed the basis of her knowledge by describing participation with the defendant in past drug transactions. *Id.* at 297, 534 A.2d 362. In the case *sub judice,* Griffith told Marzec about prior dealings with Massey. *See also, e.g., State v. Martinez,* 150 N.C.App. 364, 562 S.E.2d 914, 916–17 (2002) (after serving warrant, police learn from now cooperative subject of warrant about two drug dealers on their way to house), *appeal dismissed and discretionary review denied,* 356 N.C. 172, 568 S.E.2d 859 (2002).

*Cf. State v. Purvey,* 129 Md.App. 1, 15, 740 A.2d 54 (1999) (co-defendant's statement may provide sufficient probable cause), *cert. denied,* 357 Md. 483, 745 A.2d 437 (2000).

The police were able to verify the details provided by Griffith. Although we emphasized in *Dixon* that " 'the tip must provide something more than facts or details that are readily visible to the public[,]' " *Dixon, supra,* 133 Md.App. at 697, 758 A.2d 1063 (quoting *Hardy v. State,* 121 Md.App. 345, 363, 709 A.2d 168 (1998)), the reliability of Griffith's information was enhanced when his statements about Massey's future actions were verified and were placed within the context of his past dealings with Massey. *See Herod,* 311 Md. at 295, 534 A.2d 362. The following passage from the Supreme Court is relevant:

> We think it also important that, as in *[Illinois v.] Gates,* "the anonymous [tip] contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted." ... The fact that the officers found a car precisely matching the caller's description in front of the 235 building is an example of the former. Anyone could have "predicted" that fact because it was a condition presumably existing at the time of the call. *What was important was the caller's ability to predict respondent's* future behavior, *because it demonstrated inside information—a special familiarity with respondent's affairs. The general public would have had no way of knowing that respondent would shortly leave the building, get in the described car, and drive the most direct route to Dobey's Motel.* Because only a small number of people are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities.... When significant aspects of the caller's predictions were verified, there was reason to believe not only that the caller was honest but also that he was well informed, at least well enough to justify the stop.

*Alabama v. White,* 496 U.S. 325, 332, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (emphasis added) (citations omitted). *Compare Florida v. J. L.,* 529 U.S. 266, 271, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (noting that anonymous call provided no predictive information).

This is not to say that every informant's "prediction" serves to bolster a tip. The informant in *Dixon* advised police that Dixon would arrive at the parking garage at a certain time, driving a particular car. As Judge Hollander pointed out, "the kind of information provided by the tipster, such as [Dixon's] place of employment and his schedule, could have been known to Dixon's coworkers [and many others]." *Dixon, supra,* 133 Md.App. at 696–97, 758 A.2d 1063. Certainly, some information provided by an informant may pertain to matters " '[a]nyone could have "predicted[.]" ' " *Hardy v. State,* 121 Md.App. 345, 359, 709 A.2d 168 (quoting *Alabama v. White,* 496 U.S. at 332, 110 S.Ct. 2412), *cert. denied,* 351 Md. 5, 715 A.2d 964 (1998).

"Corroboration requires 'an assessment of probabilities.' " *United States v. Canfield,* 212 F.3d 713, 719 (2d Cir.2000) (citing *Illinois v. Gates,* 462 U.S. at 232, 103 S.Ct. 2317). And the verified corroborative details supplied by Griffith make *Dixon* inapposite. Police were informed that Massey would drive to the Delmarva Inn by one of two possible routes in either a green Ford Explorer or on a motorcycle, "upon Mr. Griffith telephoning [him]." Unlike Dixon, who was scheduled to work at the Nordstrom's store, and presumably would adhere to that schedule in driving to work and parking at the garage near his store, Massey's trip was prompted by a telephone call from Griffith. Not long after the telephone conversation with Griffith, Massey's green Ford Explorer was seen heading south on Route 13 toward the Delmarva Inn. Marzec verified Massey's identity, as well as his ownership of the vehicles Griffith said he owned, by information and a photograph from the State of Delaware's public records. Massey arrived as predicted and went directly to Griffith's door, even leaving the Explorer's motor running in the process. Before this, Griffith told Marzec that he and Massey

had conducted similar transactions in the past, and Marzec testified that Griffith told him that the transaction would usually entail the transfer of $300 worth of drugs. Griffith even explained to Marzec that he would tell Massey that he was "ready" and then Massey would be on his way.

We are satisfied that on these facts the police had sufficient probable cause to arrest Massey. *See Herod,* 311 Md. at 295–97, 534 A.2d 362. The basis of Griffith's knowledge was easily established because his information was grounded on his past conduct of dealing with Massey, and by the events as they unfolded in Marzec's presence. The reliability of his information was confirmed by the corroboration of details by the police, and his veracity was enhanced by the fact that he provided the information "face-to-face" with Marzec under circumstances that would make his information more likely to be true, *viz.* his arrest by the police.

We find no error in the denial of the motion to suppress.

### 2. Whether the trial court erred by not directing the State to provide the defense with a witness's report.

The trial court first heard testimony from Marzec, who, except for details about Griffith, essentially reiterated the account that he had provided in the hearing on Massey's motion to suppress. Since Massey does not question the sufficiency of the evidence, we need only recite Marzec's trial testimony in detail where necessary to address the issues on appeal. *See Martin v. State,* 165 Md.App. 189, 193, 885 A.2d 339 (2005), *cert. denied,* 391 Md. 115, 892 A.2d 478 (2006).

Marzec described how the police learned from Griffith that Massey would arrive at the Delmarva Inn to deliver narcotics. He elaborated on Bond's role in observing the anticipated route that Massey would take, and in alerting officers when Massey would be on his way. Marzec and two other officers arrested Massey as soon as he arrived at Room 123. A search of Massey's person, incident to this arrest, produced a plastic

baggie containing "a white rocky substance." [5]

As recounted, *supra,* after spotting Massey's Explorer on Route 13 South, Bond followed Massey to the Delmarva Inn. When Marzec informed Bond that Massey had been arrested, Bond searched the Explorer, from which he recovered a plastic baggie containing crack cocaine. This evidence was admitted.

At issue here is whether Bond should have been permitted to testify even though the State failed to provide, through discovery, any report that he may have prepared. In his direct examination, there was no mention of Bond having prepared a written report of his involvement in the investigation and later in the search and seizure.

Bond was asked on cross-examination whether he had prepared a report. He recalled that, while he believed that he had, he had not used it to prepare his testimony, and did not bring a copy to court. Defense counsel took issue with the fact that a possible report prepared by Bond had not been provided by the State, as is reflected by the following:

[DEFENSE COUNSEL]: Corporal [sic] Bond, part of your training includes the importance of accurately recording important details in your report, is that correct?

[SERGEANT BOND]: Yes.

Q. Did you file a report in this case?

A. I believe so.

Q. Do you have that with you here today?

A. No, I do not.

Q. Do you know where it is?

---

5. This bag contained approximately 3.9 grams of suspected crack cocaine. The cocaine taken from Massey was suppressed because the State failed to show that it had provided discovery of the lab report produced on the analysis of this cocaine. The trial court permitted the detective to testify that he had recovered the plastic baggie. Without objection, Marzec offered his opinion about the significance of the quantity that had been recovered, and was queried at length about different measurements of the contents of the bag that were recorded in his report and the statement of probable cause.

A. I imagine it's at the office, I don't need it.

Q. Did you review it in preparation for your trial here today?

A. No.

Q. You recall all the testimony that you stated today?

A. Yes, I do.

Q. Did you submit a copy to the State?

A. I have no idea. I didn't do it.

Q. You didn't do what?

A. I didn't pull a case, no, it's not my case.

Q. Well, you participated in this case?

A. Yes.

[DEFENSE COUNSEL]: Your Honor, there's obviously a report out there we did not get, we have no information about any of the testimony that this particular officer is testifying to here today. We could not have filed a motion to compel because we don't know if it's not been provided to us. We simply assumed that there was no report. Now that there's a report out [there] somewhere we don't have the opportunity to effectively cross-examine this officer. It's a little bit of an unfair surprise.

THE COURT: First of all, the issue of the report was never brought up in his direct examination. So at first blush one can say that this is improper cross-examination. But let's assume you're saying it goes to his ability to perceive or recount or observe what happened on June 18, 2004. But in response to that the officer says I don't need the report. The only reason he would need the report would be to refresh his recollection.

[DEFENSE COUNSEL]: And I would agree but respectfully I don't think that obviates the requirement of the State to provide us with those reports in advance when a specific request was made of the State.

THE COURT: But she didn't offer the report into evidence and the officer says he does not need the report to testify,

therefore assuming you even asked for it what bearing does the report have on anything pertaining to this case?

[DEFENSE COUNSEL]: Well, Your Honor, it would enable me to effectively cross-examine the officer with those events that he recorded in the report immediately after the incident. In this particular case I asked for any and all reports which have been reduced to writing. There's only two officers essentially involved in this case. The one report that we have is really deficient with information to effectively cross-examine. There's a report out here that the State apparently has or may have that's not been provided to us.

I just don't think that's fair, Your Honor, I don't see how I can effectively cross-examine an officer without that report that was specifically requested.

THE COURT: I'm overruling the objection.

Massey's complaint is two-fold. He first asserts that Bond's written report should have been disclosed and provided pursuant to *Carr v. State,* 284 Md. 455, 397 A.2d 606 (1979) and *Leonard v. State,* 46 Md.App. 631, 421 A.2d 85 (1980), *aff'd,* 290 Md. 295, 429 A.2d 538 (1981). Additionally, Massey contends that Bond's report should have been provided in discovery under the authority of Md. Rule 4–263(a)(2)(A).[6]

The State responds in two ways. First, it asserts that Massey has waived the issue, implying that Massey is not entitled to relief because he "never took steps to verify that the report actually existed." Alternatively, the State suggests that, assuming the matter is before us, the trial court's error was harmless beyond a reasonable doubt.

---

6. Maryland Rule 4–263(a)(2)(A) provides:
 **Rule 4–263. Discovery in circuit court.**
 Discovery and inspection in circuit court shall be as follows:
 (a) Disclosure without request. Without the necessity of a request, the State's Attorney shall furnish to the defendant:
 \* \* \*
 (2) Any relevant material or information regarding: (A) specific searches and seizures, wire taps or eavesdropping[.]

In *Carr,* the Court held that the defendant had a right to obtain and use the written statements of a prosecution witness for purposes of cross-examination or impeachment. 284 Md. at 472–73, 397 A.2d 606. Judge Smith specifically observed:

Effective cross-examination here made it necessary that defense counsel be permitted to directly confront the witness with his inconsistent prior statement. To deny to defense counsel the tool necessary for such adequate cross-examination under these circumstances amounts in our view to a denial to the defendant of due process of law.

*Id.*

In *Leonard,* this Court elaborated on the principles set forth in *Carr:*

Carr makes clear beyond question that a defendant's right, at trial, to inspect the prior statement of a State's witness who has testified is not necessarily limited (1) by the rules pertaining to pretrial discovery, or (2) to statements that are merely exculpatory. When confronted with the actual testimony of a critical witness and the knowledge that the witness has given a prior statement bearing on a material issue in the case, counsel is not engaged in a mere "fishing expedition" in seeking access to the prior statement. At that point, it becomes more than a matter of casting a seine over the State's files to see what turns up, but of directly confronting the witness; and the statement thus assumes a specific importance and relevance beyond its general value for trial preparation.

46 Md.App. at 637–38, 421 A.2d 85.

The principles adopted in *Carr* were drawn from the Supreme Court's decision in *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957). *See Jones v. State,* 310 Md. 569, 583, 530 A.2d 743 (1987), *vacated,* 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d 916, *aff'd in part and vacated on other grounds,* 314 Md. 111, 549 A.2d 17 (1988). In the wake of the Supreme Court's decision, Congress acted quickly to codify the rules articulated in *Jencks* by passing the "Jencks

Act," which "clarif[ies] and limit[s] the *Jencks* holding." [7]
*Robinson v. State,* 354 Md. 287, 303, 730 A.2d 181 (1999). *See*
Wright, Federal Practice and Procedure, Criminal 3d § 436 at
195 (2000). Although the Maryland General Assembly has not
enacted a counterpart to the federal statute, "Maryland courts
have looked to the Act, as well as subsequent analysis and
interpretation of the [Jencks Act], for guidance in interpreting
the reach and ramifications of the *Carr* decision." *Robinson,*
*supra,* 354 Md. at 303, 730 A.2d 181.

In *Butler v. State,* 107 Md.App. 345, 667 A.2d 999 (1995),
this Court held that an officer's report was a "statement" that
is subject to disclosure for the purposes of *Carr/Leonard*
analysis. Bond's response of "I believe so" to a question of
whether he had prepared a report placed the issue of disclo-
sure squarely before the court.

### Waiver and Adequate Request

When defense counsel raised the issue of a Bond report, the
trial court implied that because the issue of the report had not
come up in direct examination, Massey's arguments with
respect to the report constituted "improper cross-examina-
tion." We disagree.

The State bears the affirmative obligation to pro-
vide the disclosure that is required under *Carr/Leonard. See*
*Butler, supra,* 107 Md.App. at 358–59, 667 A.2d 999. More-
over, defense counsel was unaware until cross-examination
that a report may have been prepared by Bond. The disclo-
sure of such a document is generally needed to assist in cross-
examination, and the issue may not arise until defense counsel
begins that task. That is particularly so under the facts
before us, where the State made no such reference during
Bond's direct examination. To hold that a request for a
statement under *Carr/Leonard* is beyond the scope of cross-
examination merely because the prosecutor did not ask the
witness about it during direct examination would undermine

---

7. Pub. Law No. 85–269, 71 Stat. 595–596 (1957) (codified at 18 U.S.C.
§ 3500 (2000)). *See* Fed.R.Crim.P. 26.2.

the policy concerns as set forth in the Maryland cases and their federal counterparts. Such a rule would also allow the prosecution to dictate the non-disclosure of *Carr/Leonard* material by avoiding any mention of such material on direct examination.

The State also urges that this issue has been waived, that Massey has not adequately substantiated his request for Bond's report, and that there is no showing that the report in fact exists. The State's position lacks merit. The trial transcript reflects that Massey vigorously asserted his right to any statement that Bond may have prepared. Indeed, the trial court understood as much by overruling counsel's objection. We believe that, on these facts, there was a sufficient request for *Carr/Leonard* material.

The record also provides a sufficient foundation for the probability of the report's existence. Bond "believed" that he had written a report, although he denied using it to prepare for trial, or filing it with the State. While the burden rests with the defense to invoke the disclosure, we agree with the Ninth Circuit that " '[n]o ritual of words' is required, but the defendant must plainly tender to the Court the question of the producibility of the document *at a time when it is possible for the Court to order it produced,* or to make an appropriate inquiry." *United States v. Hanna,* 55 F.3d 1456, 1459 (9th Cir.1995) (citations omitted) (emphasis in original).

The State also maintains that the issue has been abandoned because counsel failed to move to strike Bond's testimony. In *Banks v. United States,* 348 F.2d 231, 235 (8th Cir.1965), the Eighth Circuit rejected the government's argument that the defendant waived the right to examine disputed material because counsel failed to move to strike the witness's testimony. Although that decision rested on 18 U.S.C.A. § 3500(d), which places the burden on the trial court to strike the witness's testimony, we believe that, in the instant circumstances, where counsel raised the issue of Bond's report, and Bond "believed" that he had prepared a report, counsel was not obligated to move to strike to assure preservation. We note that, in *Butler, supra,* 107 Md.App. 345, 667 A.2d 999,

there was no indication that defense counsel had moved to strike Agent Bloomer's testimony. Nevertheless, we reversed Butler's conviction because the failure to disclose a pertinent report compromised Butler's right to effective cross-examination.

We conclude that the trial court erred in its disposition of Massey's request. Bond's testimony with respect to the report was, at best, equivocal and unhelpful. The situation was exacerbated by the State's silence. Despite the State's obligation under Md. Rule 4–263 to provide such a report in discovery, the prosecutor made no effort to assuage the issue by providing relevant information. The State, at that juncture, in fulfillment of its discovery obligation, should have affirmatively advised the trial court that such report either did or did not exist. Or, if the State was likewise uncertain, the State ought to have sought from the court the opportunity to clarify whether such a report was made. There was no effort by the prosecutor to clarify whether a report had been provided to her office, or whether she would assist in making the report available. The State's ill-advised silence served only to compound the problem.

In the circumstances, and in view of the State's silence, the trial court had an "affirmative duty" to ascertain whether Bond's report indeed existed and, if so, to ensure that it was available for review. *See Saunders v. United States,* 316 F.2d 346, 349 (D.C.Cir.1963) (citing *Campbell v. United States,* 365 U.S. 85, 95, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961)). It is not for the witness to declare, as did Bonds, that the report was not used for his testimony. The disclosure decision was not his to make. Whether the report is useful to the defense is up to the defendant. *See Butler, supra,* 107 Md.App. at 360, 667 A.2d 999 (quoting *Aud v. State,* 72 Md.App. 508, 522–23, 531 A.2d 706 (1987)).

### Harmless Error

Alternatively, the State suggests that the court's error, if any, in not ordering disclosure of the Bond report is harmless beyond a reasonable doubt, arguing that

any such error, if it does exist, was harmless. Massey asks for reversal when he has failed to establish: (1) the existence of the report; and (2) that if the report existed, it contained anything that would have assisted him in cross-examination.

Our discussion, above, has disposed of the State's first assertion: the burden of delivering such report rests with the State, not the defendant. The State's second contention is likewise without merit. To suggest that appellant ought to bear the burden of establishing useful information from a report with which he has not been provided is, at best, disingenuous.

That is not to say that such an error can never be subject to a harmless error review. *See Butler, supra,* 107 Md.App. at 360, 667 A.2d 999. On these facts, we are not able, however, to declare that failure to disclose, or to determine the existence of, Bond's report is harmless beyond a reasonable doubt. Bond was not a peripheral player in the investigation. He alone was the searching and seizing officer of the contraband that was admitted into evidence. His involvement was substantive.

Accordingly, we shall vacate Massey's convictions and remand for a new trial. We are confident that, on remand, the State will comply with its discovery obligations.

### 3. *Whether the trial court erred by considering evidence outside of the record.*

On the day of Massey's arrest, police confiscated two separate baggies of crack cocaine. The first, from his person, contained 3.9 grams by weight. The second, from his vehicle, contained 3.1 grams. Massey's objection to the admission of the laboratory analysis of the 3.9 grams was sustained, and admission was precluded as a discovery sanction against the State, although Marzec made reference to that contraband during his testimony. In fact, the court engaged in a colloquy with Marzec as to the significance of 3.9 grams *vis a' vis* 3.1 grams in terms of intent to distribute as opposed to personal

use. The second, smaller quantity, and the laboratory analysis, was admitted.

Massey argues that the trial court erred in permitting discussion of the 3.9 grams, even though the laboratory analysis was excluded. Essentially, Massey suggests that the court took into account the total amount of cocaine seized from him in reaching its verdict of possession with intent to distribute, and that the possession of only 3.1 grams is insufficient to infer such an intent.

Marzec was able to elaborate on the significance of the contraband he seized from Massey.

[PROSECUTOR]: And with respect to the quantity that you extracted from the Defendant, Mr. Massey, what's the significance of that?

[DETECTIVE MARZEC]: Your Honor, the quantity that was recovered by myself from Mr. Massey's person, the quantity of the substance is indicative of the intent to distribute. A common user amount of crack cocaine is normally, when purchased on the street, one to two pieces. A piece of crack cocaine averages around one tenth to two tenths of a gram which sells for $20 to $40.

Your Honor, the quantity that was located within the bag ended up being approximately 3.9 grams. And based on my training and experience, Your Honor, that would be significantly more than for personal use.

The trial court heard testimony from Arthur Fassio, Jr., a State Police forensic chemist, who performed the analyses on the bags that were seized from both Massey's person and the Ford Explorer. Fassio was not permitted to testify about the results of his testing on the contents of the bag that was seized from Massey in the hotel room, because of the discovery sanction.[8] With respect to the contraband seized from the

---

8. The defense objected to testimony pertaining to State's Exhibit 1, the cocaine seized from Massey's person. The trial court sustained the objection, referring to this quantity as "the 3.1 grams."

Explorer, Fassio opined that the baggie contained a substance with a net weight of 3.1 grams, consisting of cocaine.

After the State rested, the defense moved for a judgment of acquittal. Counsel argued that the evidence was insufficient to sustain the charge of possession with intent to distribute based on the suppression of the analysis of the drugs found on Massey in the hotel room. Because that evidence was excluded, the State was left with the single baggie from the Explorer; hardly evidence, in Massey's view, of possession with intent to distribute.

The trial court denied the motion, ruling:

But in evidence at this time is cocaine in the quantity of 3.1 grams found in the vehicle that [Massey] was operating, so I think the State has made a case sufficient to carry it beyond a motion for judgment of acquittal at this stage and I deny your motion.

The defense called Marzec to testify. After counsel was finished, the court inquired:

I have a question of the officer, which is you testified earlier as to the significance of a quantity of cocaine in the amount of 3.9 grams. Do you have an opinion as an expert in the area of controlled dangerous substances with respect to the significance of an amount of cocaine equaling 3.1 grams?

[MARZEC]: Your Honor, my opinion would be the same as the 3.9 as it would be to 3.1. There's not that much of a difference between eight tenths of a gram. Basically on the street it's equivalent of an eight ball and usually an eight ball quantity is used for distribution purposes.

\* \* \*

THE COURT: Let me just follow up. So I derive from that that 3.1 grams is not indicative of what a mere user would possess?

[MARZEC]: No, Your Honor. The packaging of the 3.1 grams and the weight of the 3.1 grams based on my training

and experience, Your Honor, is indicative of the intent to distribute the same.

Marzec recounted on redirect examination that the 3.1 grams were contained in a single bag. When asked whether he would agree that a person who would distribute the cocaine would package it separately, Marzec indicated that it would depend on the level of dealer. He explained:

In this particular case, taking into account the other bag that was also recovered along with the 3.1 grams of suspected crack cocaine that was recovered from the vehicle, two bags equally of the same approximate weight I believe is indicative of the intent to distribute.

He admitted that an addict could use 3.1 grams and even as much as ten grams over the course of a few days, but noted that "a monetary factor comes into play."

After hearing final argument, the trial court ruled as follows:

The Court has before it the testimony of three witnesses, three called by the State, two called by the Defendant, but they were one and the same, essentially three witnesses, two of whom were qualified as expert witnesses.

Detective Ronald Marzec of the Delmar Police Department, an expert in law enforcement matters pertaining to controlled dangerous substances, received information that the Defendant, Richard Massey, was approaching Maryland, specifically Delmar, in either a green Ford Explorer or a Honda motorcycle. As a result of that information he arrested Richard Massey in room 123 of the Delmarva Inn and Convention Center in Delmar, Maryland, on the 18th of June 2004 sometime between 4:00 and 5:00 p.m.

Pursuant to a search incidental to a lawful arrest he received a plastic baggie from the front pocket of the Defendant and he testified that the substance was 3.9 grams. The substance was not admitted into evidence for procedural reasons, essentially as a discovery sanction. Notwithstanding the fact that the substance was not admitted into evidence without objection he testified that 3.9

grams of whatever it was, because he was not allowed to say what it was, was nevertheless something that would not be consumed for personal use. That testimony alone is not persuasive with me because that was kept out of evidence.

The next witness was Sergeant Michael Bond of the Delmar Police Department who was on the lookout in Delaware on Route 13 for either a motorcycle southbound thereafter green Ford Explorer or a Honda. He saw a green Ford Explorer on Route 13 in Delaware, shortly crossing into Maryland. The vehicle was within his visual observation until it was parked ultimately near or at the Delmarva Inn and Convention Center.

Whereupon he observed the Defendant, who he identified in court, Richard Massey, getting out of the vehicle. He also observed that Richard Massey was alone in the vehicle and he did lose sight of the Defendant but shortly thereafter he received a radio call from Detective Marzec indicating that the Defendant was under arrest in one of the rooms in the motel. In the meantime the green Ford Explorer had been under his constant surveillance and there was no evidence that any one entered the vehicle during that time period.

Upon learning of the arrest, he searched the Defendant's vehicle and located a plastic baggie in the overhead console, which he weighed on a portable scale later at the Delmar Police Department headquarters and said it was two and a half grams gross weight.

The substance in that plastic baggie ultimately made its way to the Maryland police lab and was tested by the third witness in this case, Arthur Fassio, who qualifies as an expert witness, forensic chemist in the field of controlled dangerous substances. He describes his testing procedures and arrived at a conclusion that the substance he was testing was 3.1 grams of cocaine. That was admitted into evidence as State's Exhibit No. 2.

Despite the best efforts of defense counsel I do not find any serious questions or issues raised regarding the chain of custody, the testing procedures themselves, any indication

of any induced change by virtue of the passage of time or mishandling of evidence and there is no evidence of tampering.

In response to my question later Detective Marzec testified that 3.1 grams as a quantity does not indicate personal use but would indicate an intent to distribute.

This testimony earlier as a part of the State's case had been that one piece would be .1 or .2 grams, that would be what a user would typically have. 3.1 grams obviously adds up to 15 or 16 pieces.

Detective Marzec also testified that by virtue of the fact that the substance was packaged in two bags, although no evidence came in regarding the actual identity of the substance in the other bag, the fact that there were two bags does give inference that there is an intent to distribute.

Going back to the amount that wasn't admitted into evidence, 3.1 grams, that almost equaled the amount known in the trade as an eight ball, which he said had a wholesale value of $150, $250 and a street value of $700.

I think of significance also is the fact that the police in this case had received information that the Defendant is heading to a specified room at a specified motel and the question arises why does a user drive from one state to another state, rent a motel room, which he pays for out of his own pocket in order to use drugs. There's an inference that that trip was for the purpose of distributing the substance which was found in his vehicle.

Therefore I have no problem finding beyond a reasonable doubt that the Defendant is guilty under count one of felonious possession of cocaine. He's also guilty under count two but count two merges into count one.

The trial judge in the instant case was clearly aware of what evidence had been admitted, and what was not in the record. Massey's objection went only to the laboratory analysis report of the 3.9 gram package. The court's ruling sustained that objection—"I'm sustaining the objection based upon [the State's] failure to provide discovery as to the 3.9 grams."

In its elaboration of the verdict of guilty of possession of cocaine with intent to distribute, the trial court said, in part:

Detective Marzec also testified that by virtue of the fact that the substance was packaged in two bags, although no evidence came in regarding the actual identity of the substance in the other bag, *the fact that there were two bags does give inference* [sic] *that there is an intent to distribute.*

(Emphasis added).

In a bench trial, the court may not rely on facts that are not in the record. In *Corbett v. State*, 4 Md.App. 269, 242 A.2d 603 (1968), the trial court referenced the fact that an alibi witness—one Morgan—had been indicted with Corbett in another matter. This led the trial judge to reject Morgan's testimony, especially in view of his denial that he even had known Corbett. Judge Thompson wrote for this Court:

We hold that the trial judge was clearly erroneous when he relied upon knowledge acquired from outside of the record that Corbett and Morgan had been jointly indicted for other offenses. The other indictments were not introduced into evidence and were not called to the attention of the judge on the record, and it was not until the decision was announced that the trial judge indicated that he had any knowledge of these other indictments.

*Id.* at 273, 242 A.2d 603.

Certainly, the trial court was aware of that evidence which had been excluded—the results of the forensic analysis of the item seized from Massey's person. The Court of Appeals has observed:

"[I]t is clear that we have consistently reposed our confidence in a trial judge's ability to rule on questions of admissibility of evidence and to then assume the role of trier of fact without having carried over to his factual deliberations a prejudice on the matters contained in the evidence which he may have excluded."

*Graves v. State*, 298 Md. 542, 547, 471 A.2d 701 (1984) (quoting *State v. Hutchinson*, 260 Md. 227, 236, 271 A.2d 641 (1970)).

While the trial judge in this case was certainly aware of what evidence had been admitted and what was not in the record, his decision nevertheless demonstrates that the identity of the other substance played some part in the finding that Massey had possessed cocaine in sufficient quantity to indicate the intent to distribute it. Notwithstanding that there is sufficient evidence of possession with intent to distribute based solely on the possession of 3.1 grams of cocaine that was in Massey's Ford Explorer, we are unable to conclude that the trial judge ignored the persistent references to the other substance and other bag. We would also vacate Massey's conviction for possession with intent to distribute cocaine, and remand for a new trial on that charge.

### 4. *Whether the trial court erred in accepting Massey's jury trial waiver.*

Massey next asserts that he is entitled to reversal because the trial court made no finding that his waiver of his right to a trial by jury was intelligently and voluntarily made. We are satisfied that the waiver procedure was adequate and in compliance with Md. Rule 4–246. While consideration of this issue is not relevant to our ultimate disposition, we pause to discuss it briefly.

In *Zylanz v. State,* 394 Md. 632, 635, 907 A.2d 242 (2006),[9] the Court of Appeals was presented with the question of "whether the . . . trial judge[ ] . . . erred by not making explicit findings on the record regarding the knowing and voluntary waiver[ ] of the Petitioner['s] right[ ] to trial by jury, in accordance with Maryland Rule 4–246(b)." In responding to that question, the Court said:

As we noted . . . Maryland Rule 4–246(b) presently does not compel, by its language, that the trial judge supply an explicit statement regarding his or her findings of the knowingness and voluntariness of a defendant's jury trial waiver. Therefore, where the record of the case sufficiently

---

**9.** *Zylanz v. State* was consolidated with *Powell v. State.* The cases are reported as *Powell v. State,* 394 Md. 632, 907 A.2d 242 (2006).

demonstrates that the trial court implicitly determined that the elements of a knowing and voluntary jury trial waiver existed, the Rule is not violated.

*Id.* at 643, 907 A.2d 242.[10]

We are satisfied that the record before us, "sufficiently demonstrates that the trial court implicitly determined that the elements of a knowing and voluntary jury trial waiver existed[.]" [11]

---

**10.** The withdrawal of a jury trial waiver is governed by Md. Rule 4–246(c), which provides:

**Withdrawal of a waiver.** After accepting a waiver of jury trial, the court may permit the defendant to withdraw the waiver only on motion made before trial and for good cause shown. In determining whether to allow a withdrawal of the waiver, the court may consider the extent, if any, to which trail would be delayed by the withdrawal.

In *Cason v. State*, 66 Md.App. 757, 770–71, 505 A.2d 919 (1986), we noted that pursuant to this rule:

the withdrawal of a waiver of jury trial is not an absolute right, rather it is one which will be permitted within the discretion of the court and upon a showing of good cause. The trial judge's exercise of discretion must, however, be sound, that is, it must not be "arbitrary, vague, and fanciful, but legal and regular. . . ." A trial judge's exercise of discretion carries with it a presumption of validity, therefore, the accused must establish an abuse of discretion before he is entitled to relief.

(Citations omitted).

In *United States v. Lee*, 539 F.2d 606, 608 (6th Cir.1976), the United States Court of Appeals for the Sixth Circuit held that where "a reviewing court finds error in the conduct of a trial and reverses with directions for a new trial . . . the general rule is that a litigant is not bound by his prior waiver of a jury trial." The Court further noted that "[u]nless the language of a waiver unambiguously states that it will apply in all retrials should they be ordered, a waiver should not continue in effect after the jurisdiction of the court to which it was tendered terminates upon the taking of an appeal." *Id.* at 608–09. *Compare Brown v. State*, 89 Ga. 340, 15 S.E. 462 (1892) (Defendant who waived jury trial, was convicted by the trial court, and obtained a reversal on appeal, was permitted, on return to the trial court, to withdraw waiver and demand jury trial).

**11.** In *Zylanz v. State*, 164 Md.App. 340, 351 n. 4, 883 A.2d 257 (2005), we observed that

Although neither the Rules nor the case law prescribe any particular litany or mantra, an excellent model spoken form of jury trial waiver is set out in the trial judges' benchbook. MARYLAND TRIAL JUDGES' BENCHBOOK, Sec. CR 1–1105, MICPEL, 1999 Ed. If, after those ques-

**DENIAL OF MOTION TO SUPPRESS AFFIRMED; JUDGMENTS OF CONVICTION VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR WICOMICO COUNTY FOR A NEW TRIAL.**

**COSTS ASSESSED TO WICOMICO COUNTY.**

tions are asked, the trial judge is satisfied that the waiver is knowing and voluntary, he or she ought to state so on the record. Doing so would put the waiver beyond challenge in most cases.

See also *Christian v. State,* 172 Md.App. 212, 225 n. 4, 914 A.2d 151 (2007).