995 A.2d 763

**Marshall ADAMS**

v.

**STATE of Maryland.**

**No. 1204 Sept.Term, 2007.**

Court of Special Appeals of Maryland.

May 26, 2010.

470

Amy E. Brennan (Nancy S. Forster, Public Defender, on the brief), Baltimore, MD, for Appellant.

Jeremy M. McCoy (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: HOLLANDER, MEREDITH, and CHARLES E. MOYLAN, JR. (Retired, specially assigned), JJ.

MEREDITH, Judge.

In the early morning hours of April 13, 2006, Marshall Adams, appellant, stabbed and killed Leo Morris. Upon his arrest, Adams asserted that Morris had sought to purchase cocaine from him, but when the two met to complete the sale, Morris had threatened Adams with a knife and attempted to rob him of the cocaine. Adams maintained that he had merely defended himself, but also asserted that he had "blacked out" during the altercation and could not fully recall the details.

Adams was charged in the Circuit Court for Washington County with first-degree murder, second-degree murder, and manslaughter. Defense counsel entered an appearance in his case. When the lead detective in the case subsequently visited Adams in the detention center to serve upon Adams a notice of the State's intention to seek a sentence of life without the possibility of parole, Adams made inculpatory statements to the detective. Although Adams moved to have those statements excluded at trial, the circuit court denied his motion to suppress the statements.

At trial, the State introduced evidence of the victim's numerous wounds, including a wound to the victim's right hand and various defensive wounds to the victim's left arm. Over Adams's objection, the State's expert witness in "crime scene reconstruction" noted that the victim was right-handed, and opined that the pattern of the wounds suggested that the victim's right hand was wounded early in the struggle, forcing him to attempt to defend himself with his non-dominant arm.

Because Adams alleged that the victim's murder was precipitated by a robbery attempt that led to mutual combat, he requested that the court instruct the jury on the doctrine of hot-blooded response to legally adequate provocation. The circuit court declined to do so, ruling that the evidence presented at trial did not warrant that instruction.

The jury convicted Adams of first-degree murder, and the circuit court sentenced Adams to life in prison, with all but 40 years suspended. Adams noted this appeal.

## Questions Presented

We have rephrased Adams's questions as follows: [1]

(1) Did the circuit court err in failing to suppress the statement Adams made on November 29, 2006, in which Adams admitted that he stabbed Morris multiple times, where the State elicited the incriminating statement outside the presence of Adams's attorney of record?

(2) Did the circuit court err in declining to instruct the jury on the rule of hot-blooded response to legally adequate provocation?

(3) Did the circuit court abuse its discretion in admitting expert opinion testimony about the probable sequence of the victim's wounds?

Because we hold that the admission of Adams's second incriminating statement violated his Sixth Amendment right to counsel, we vacate the judgment and remand for a new trial. We also answer "yes" to question 2, and "no" to question 3.

## Facts and Procedural History

Early in the morning of April 13, 2006, various residents of Bethel Gardens, a community on Bethune Avenue in Hagerstown, Maryland, were awakened by the sounds of Adams and Morris fighting outside on the sidewalk. The residents testified that they heard someone say "Please don't kill me,"

---

[1] Adams presented the following questions upon appeal:
1. Did the lower court err in failing to suppress Mr. Adams's statement made to the police on November 29, 2006?
2. Did the lower court err in failing to instruct the jury on the mitigating circumstances of hot blooded response to legally adequate provocation?
3. Did the lower court abuse its discretion in admitting Jeffrey Kercheval's expert testimony that Mr. Morris's dominant hand, his right, was incapacitated early in the confrontation where such testimony regarding the timing of the wound was pure conjecture?

"You're gonna kill me," or "Don't kill me man." None of the residents witnessed which man made those pleas. One of the witnesses, a paramedic, testified that when he reached Morris's body, Morris had no pulse and Adams had fled.

Detective Shane Blankenship, of the Hagerstown Police Department, was assigned to investigate the case. Based upon review of images captured by various public security cameras, the investigation focused upon Adams as a suspect. Blankenship had known Adams since 1990, when Adams "was a little kid."

Adams was arrested in Baltimore for a parole violation. Detective Blankenship and another detective drove to Baltimore, and, pursuant to a writ of habeas corpus, transported Adams to Hagerstown for questioning. In accordance with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), Detective Blankenship advised Adams of his rights, and Adams executed a *Miranda* waiver form. Adams made inculpatory statements to the detectives, and acknowledged being involved in a knife fight with Morris on the night in question.

Part of the interview was recorded on audiotape, and that recording included the following version of the confrontation. Adams said that he had planned to meet with Morris that morning because Morris wished to buy cocaine from Adams. When they met, however, instead of paying Adams for the drugs, Morris drew a knife and demanded the drugs from Adams. In the recorded statement, Adams said that, "when [Morris] made the aggressive step, I like grabbed the knife. And we just struggled like after that.... And I blacked out." Blankenship asked, "So you blacked out?" Adams replied: "Yeah. And one thing led to another." Blankenship asked, "What'd you do then?" Adams said: "After I blacked out and everything happens like I seen him step off. And when he stepped off, I was able to get away."

Adams was then charged with first-degree murder, second-degree murder, and manslaughter. He was incarcerated in the detention center pending trial.

On November 29, 2006, the prosecutor's office asked Detective Blankenship to visit Adams in the detention center and personally serve on Adams the notice of the State's intent to seek a sentence of life without the possibility of parole.[2] Detective Blankenship asked Detective Tammy Jurado to accompany him to the detention center. Explaining his reason for asking another detective to accompany him, Detective Blankenship later testified:

The implications of this document are pretty clear, very serious. It's not something I wanted to do alone. And quite simply I wanted someone else there as a witness in case something happened, in case something was said that would have been unusual. And as a matter of practice we just normally don't go out by ourselves to serve documents like this, especially for these types of cases.

Q. [BY PROSECUTOR] Now in your experience as a police officer as well as in the detective bureau, you've had—had you had occasions where suspects just blurt out statements?

A. Yes.

Q. And therefore Detective Jurado would be a witness to any such blurt?

A. That's right.

At the detention center, the detectives met with Adams in the library. Detective Blankenship explained during his testimony at the suppression hearing: "They have other interview rooms but the library is a little more comfortable ... a little more personable." Adams's attorney, who had entered an appearance in the case months earlier, was not notified that

---

**2.** Md.Code (2002), Criminal Law Article, § 2–203 reads:

A defendant found guilty of murder in the first degree may be sentenced to imprisonment for life without the possibility of parole only if:

(1) at least 30 days before trial, the State gave written notice to the defendant of the State's intention to seek a sentence of imprisonment for life without the possibility of parole; and

(2) the sentence of imprisonment for life without the possibility of parole is imposed in accordance with § 2–304 of this title.

the detectives intended to meet and confer with Adams, and was not present at the meeting. ·

At the hearing on Adams's motion to suppress the statements Adams made during the discussion on November 29, 2006, Detective Blankenship testified as follows regarding the encounter:

Q. [BY PROSECUTOR] What was your intention when you went out to the jail that day?

A. Just to serve the document.

\* \* \*

Q. Did you give him the paperwork that you were assigned to give him?

A. Yes I did.

Q. And uh did you say anything while you were giving it to him?

A. Well I asked him to read the documents because if he had any questions about those documents I wanted to be there to answer questions for him.

\* \* \*

Q. Now after he read the document did he make any statements to you?

A. Yes. Something he said was you know "I'm not feeling this." He was reading the document and he was looking at the document and he just started kind of shaking his head and I could tell he was becoming upset. It appeared to me like he was becoming a little bit angry and he just kind of said several times you know "Man I'm not feeling this."

\* \* \*

Q. Did he ask you any questions about what this document meant?

A. He wanted to know why the State was coming after him so hard for this particular case.... I can't remember his exact words but it was something to that effect, "Why are they coming after me for this so hard."

Q. Did you make any statements as a result of that?

A. Well I did. Yes I did.

Q. And what did you say?

A. Well I was taken—I didn't expect that question to come from him and I told him "Well it's because you stabbed a guy 32 times."

Q. When you said that, did you expect to elicit any other information out of him?

A. No he asked the question, I gave him an answer. That was it.

Q. As far as you were concerned that was it.

A. Yes.

Q. Okay.

A. It was just an off the cuff answer from me. Probably not very appropriate but it's what came out.

Q. Based on your understanding of why we were going to go forward with that type—

A. Yes.

Q. —of potential sentence.

A. Yes.

Q. What if anything did Marshall say as a result of that statement?

A. He said that he didn't stab the guy 32 times. He said he only stabbed the guy seven times.

Q. And in fact he started to describe where he stabbed the victim?

A. Yes.

Q. Did you stop him at any point?

A. No I did not.

Q. Did you question him?

A. No I did not.

Q. Did you say anything else to him before you left that room?

A. No I didn't respond to his comments, I sat there silent.

During cross-examination at the suppression hearing, Detective Blankenship testified as follows:

Q. [BY DEFENSE COUNSEL] Mr. Adams never contacted you to come to the jail, correct?

A. No he didn't.

Q. And you knew he had an attorney, correct?

A. I did yes.

\* \* \*

Q. ... [Y]ou asked him if he had been warned that the police were coming to serve him?

A. Yes.

\* \* \*

Q. Had anyone told you to tell Mr. Adams that his defense attorney should have or could have warned him?

A. No.

Q. ... Were you directed to contact defense [sic] prior to serving him with that document?

A. No I was not.

Q. Were there discussions with you about giving notice to his attorney prior to talking to him?

A. No.

\* \* \*

Q. You didn't [M]irandize him at that moment, correct?

A. He was not [M]irandized nor was he given any kind of warning.

\* \* \*

Q. So prior to your asking him a question, you did not tell him he had a Fifth Amendment right to remain silent, correct?

A. No I did not.

Q. Nor that he had a right to have his attorney present in any capacity, correct?

A. That's correct.

Defense counsel proffered to the suppression court that the defense attorneys were not "contacted that someone was going

to the jail to talk to our client." The prosecuting attorney stipulated, "We don't dispute that."

The motion to suppress was denied. The suppression court concluded:

I don't find that Detective Blankenship's statements to the defendant on November the 29th were reasonably likely to elicit an incriminating response and I find that the defendant's statement on the 29th was uncoerced, un-tricked and unexpected by Detective Blankenship.

At trial, the State introduced forensic evidence that Adams stabbed Morris 32 times. The State also introduced Adams's statement that he had blacked out and did not remember stabbing Morris. Over Adams's objection, the State also introduced Adams's contradictory statement that he had stabbed Morris seven times.

We will review the facts giving rise to Adams's claims that the trial court erred in admitting certain expert testimony and in failing to give a requested jury instruction as part of the discussion of those issues.

As noted above, the jury found Adams guilty of first-degree murder, and the circuit court sentenced him to life in prison with all but 40 years suspended. Adams filed a timely notice of appeal.

## Discussion

### I. Suppression

■ In *Massey v. State*, 173 Md.App. 94, 917 A.2d 1175 (2007), this Court reviewed the applicable standard of review for a circuit court's disposition of a motion to suppress evidence at trial:

In reviewing the court's disposition of a motion to suppress, "we look only to the record of the suppression hearing and do not consider the evidence admitted at trial." *In re Tariq A–R–Y*, 347 Md. 484, 488, 701 A.2d 691 (1997). In this limited review, we consider the evidence and reasonable inferences drawn therefrom in the light most favorable

to the prevailing party, in this instance the State. *Id.* We review the factual findings of the motions court for clear error. *Byndloss v. State,* 391 Md. 462, 477, 893 A.2d 1119 (2006). Although we defer to the hearing judge's findings of fact, we must make a de novo constitutional evaluation by "review[ing] independently the application of the law to those facts to determine if the evidence at issue was obtained in violation of the law[.]" *See Whiting v. State,* 389 Md. 334, 345, 885 A.2d 785 (2005).

*Id.* at 100–101, 917 A.2d 1175. *Accord Prioleau v. State,* 411 Md. 629, 638, 984 A.2d 851 (2009).

Adams argues that the circuit court erred in denying his motion to suppress the statement he made to the detectives the day he was served with the State's notice to seek a life sentence. It is Adams's contention that Detective Blankenship's accusatory comment that the State was seeking a harsh penalty because Adams "stabbed [Morris] 32 times" was the functional equivalent of interrogation outside the presence of counsel, and that it foreseeably prompted Adams to respond with an incriminating statement which the State introduced to contradict earlier statements made by Adams.

The Sixth Amendment of the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." As the Supreme Court noted in *Iowa v. Tovar,* 541 U.S. 77, 87, 124 S.Ct. 1379, 158 L.Ed.2d 209 (2004): "The Sixth Amendment secures to a defendant who faces incarceration the right to counsel at all 'critical stages' of the criminal process." In *Lodowski v. State,* 307 Md. 233, 247–49, 513 A.2d 299 (1986), the Court of Appeals recognized that the right to counsel assured by the Maryland Declaration of Rights, Articles 21, 22, and 24, is similar.

In *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985), the Supreme Court held that the state violated the Sixth Amendment right of an accused who was represented by counsel when the police persuaded a co-defendant to surreptitiously record incriminating statements

while the accused was waiting for trial. The Court observed, *id.* at 168–69, 106 S.Ct. 477 (footnote omitted):

The right to the assistance of counsel guaranteed by the Sixth and Fourteenth Amendments is indispensable to the fair administration of our adversarial system of criminal justice. Embodying "a realistic recognition of the obvious truth that the average defendant does not have the professional legal skill to protect himself," *Johnson v. Zerbst,* 304 U.S. 458, 462–463, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), the right to counsel safeguards the other rights deemed essential for the fair prosecution of a criminal proceeding.

In *Moulton,* the Court recognized the importance of representation prior to trial, noting that "to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself." *Id.* at 170, 106 S.Ct. 477. The Court stated, 474 U.S. at 177 n. 14, 106 S.Ct. 477 (emphasis added):

*The Sixth Amendment protects the right of the accused not to be confronted by an agent of the State regarding matters as to which the right to counsel has attached without counsel being present.* This right was violated as soon as the State's agent engaged Moulton [the accused] in conversation about the charges pending against him.

In *Michigan v. Harvey,* 494 U.S. 344, 357–358, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990), the Court described the Sixth Amendment right as follows:

The accused's right to the assistance of counsel is not limited to participation in the trial itself. A defendant is entitled to the aid of his lawyer from the time of arraignment "when consultation, thoroughgoing investigation and preparation [are] vitally important," *Powell v. Alabama,* 287 U.S. 45, 57, 53 S.Ct. 55, 77 L.Ed. 158 (1932), through the time of first appeal. *See Penson[ v. Ohio],* 488 U.S. [75], at 85[, 109 S.Ct. 346, 102 L.Ed.2d 300 (1988)]; *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967); *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963). Just as the Sixth Amendment's right

to "the Assistance" of counsel necessarily encompasses a right to the effective assistance of counsel, *see [U.S. v.] Cronic,* 466 U.S. [648], at 654–655[, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)]; *Avery v. Alabama,* 308 U.S. 444, 446, 60 S.Ct. 321, 84 L.Ed. 377 (1940), so too the accused's right to have counsel "for his defence" in a "criminal prosecutio[n]" includes the right to rely on counsel after the government's role has shifted from investigation to accusation and the "defendant finds himself faced with the prosecutorial forces of organized society." *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972) (opinion of Stewart, J.); *see also Moran v. Burbine,* 475 U.S. 412, 430, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

In a footnote to the above quoted passage, the Court stated in *Harvey,* 494 U.S. at 358 n. 4, 110 S.Ct. 1176:

The Court has recognized that the defendant has a right to counsel . . . during a pretrial interrogation when the State attempts to elicit information directly from the accused. *Brewer v. Williams,* 430 U.S. 387, 401, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *id.,* at 415[, 97 S.Ct. 1232] (Stevens, J., concurring). See also *Coleman v. Alabama,* 399 U.S. 1, 9, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970); *Hamilton v. Alabama,* 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961). The Court has also applied the Sixth Amendment's protection to surreptitious government attempts to deliberately elicit information from the indicted defendant. See *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985); *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

More recently, in *Rothgery v. Gillespie County,* 554 U.S. 191, ——, 128 S.Ct. 2578, 2583, 171 L.Ed.2d 366 (2008), the Court confirmed that the Sixth Amendment right to counsel attaches at the time of "the initiation of adversary judicial criminal proceedings." The Court stated, *id.:*

We have, for purposes of the right to counsel, pegged commencement to " 'the initiation of adversary judicial crim-

inal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment,'" *United States v. Gouveia,* 467 U.S. 180, 188, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984) (quoting *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972) (plurality opinion)). The rule is not "mere formalism," but a recognition of the point at which "the government has committed itself to prosecute," "the adverse positions of government and defendant have solidified," and the accused "finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." *Kirby, supra,* at 689, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411.

In *Moran v. Burbine,* 475 U.S. 412, 428, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), the Court noted:

> It is clear, of course, that, absent a valid waiver, the defendant has the right to the presence of an attorney during any interrogation occurring after the first formal charging proceeding, the point at which the Sixth Amendment right to counsel initially attaches. *United States v. Gouveia,* 467 U.S. 180, 187, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984); *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972) (opinion of Stewart, J.). *See Brewer v. Williams,* 430 U.S., at 400–401, 97 S.Ct. 1232. And we readily agree that once the right has attached, it follows that the police may not interfere with the efforts of a defendant's attorney to act as a " 'medium' between [the suspect] and the State" during the interrogation. *Maine v. Moulton,* 474 U.S. 159, 176, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985); *see Brewer v. Williams, supra,* at 401, n. 8, 97 S.Ct. 1232.

In *Maine v. Moulton, supra,* 474 U.S. 159, 106 S.Ct. 477, the Court observed that, once an accused has invoked the Sixth Amendment right to assistance of counsel, the state has an obligation to honor the exercise of that right. The Court stated, 474 U.S. at 170–71, 106 S.Ct. 477 (footnote omitted):

Once the right to counsel has attached and been asserted, the State must of course honor it. This means more than simply that the State cannot prevent the accused from obtaining the assistance of counsel. The Sixth Amendment also imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek this assistance. We have on several occasions been called upon to clarify the scope of the State's obligation in this regard, and have made clear that, at the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel.

. . . As Justice Douglas succinctly put the point, "what use is a defendant's right to effective counsel at every stage of a criminal case if, while he is held awaiting trial, he can be questioned in the absence of counsel until he confesses?" [(Quoting *Spano v. New York*, 360 U.S. 315, 326, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959)).]

In *Michigan v. Jackson*, 475 U.S. 625, 635, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), *overruled, Montejo v. Louisiana*, 556 U.S. ——, 129 S.Ct. 2079, 2091, 173 L.Ed.2d 955 (2009), the Supreme Court held that, once an accused has indicated he wants the assistance of counsel, further questioning by the state or its agents is prohibited unless communications are subsequently initiated by the accused, and that any prereported waiver of this right by the accused is invalid. Under the rule expressed in *Michigan v. Jackson*, 475 U.S. at 635, 106 S.Ct. 1404, the state could never establish a valid waiver of the Sixth Amendment right to counsel once it had been invoked. The Court held: "Just as written waivers are insufficient to justify police-initiated interrogations after the request for counsel in a Fifth Amendment analysis, so too they are insufficient to justify police-initiated interrogations after the request for counsel in a Sixth Amendment analysis." The Court stated, *id.* at 636, 106 S.Ct. 1404: "We thus hold that, if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any

waiver of the defendant's right to counsel for that police-initiated interrogation is invalid."

The Court indicated in *Patterson v. Illinois*, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988), that the holding of *Michigan v. Jackson*—that "any waiver" of the Sixth Amendment right to counsel was "invalid"—was not etched in stone. After being indicted, Patterson, of his own volition, asked police officers why another person had not also been indicted. After Patterson reviewed and signed a *Miranda* waiver form, he made incriminating statements. He was interviewed a second time by the prosecutor, who again reviewed the *Miranda* warnings and had Patterson sign another waiver form, after which Patterson made further incriminating statements. Patterson moved to suppress the statements on the ground that they were obtained in violation of his Sixth Amendment right to counsel. The Supreme Court denied Patterson's claim. Although the Court agreed that "[t]here can be no doubt that petitioner had the right to have the assistance of counsel at his postindictment interviews with law enforcement authorities," 487 U.S. at 290, 108 S.Ct. 2389, the Court noted that Patterson had never actually retained or accepted by appointment counsel to represent him. *Id.* at 290 n. 3, 108 S.Ct. 2389. The Court distinguished *Michigan v. Jackson,* stating: "Our decision in *Jackson*, however, turned on the fact that the accused 'ha[d] asked for the help of a lawyer' in dealing with the police." *Id.* at 291, 108 S.Ct. 2389. The Court explained, *id.*:

> Preserving the integrity of an accused's choice to communicate with police only through counsel is the essence of *Edwards* and its progeny—not barring an accused from making an initial election as to whether he will face the State's officers during questioning with the aid of counsel, or go it alone. If an accused "knowingly and intelligently" pursues the latter course, we see no reason why the uncounseled statements he then makes must be excluded at his trial.

Having determined that the Sixth Amendment right to counsel *could* be waived after indictment, the *Patterson* Court

examined whether the purported waiver in the case was knowing, intelligent, and voluntary. The Court stated:

> In the past, this Court has held that waiver of the Sixth Amendment right to counsel is valid only when it reflects "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst, supra,* [304 U.S.] at 464, 58 S.Ct. 1019. In other words, the accused must "kno[w] what he is doing" so that "his choice is made with eyes open." *Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942). In a case arising under the Fifth Amendment, we described this requirement as "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). Whichever of these formulations is used, the key inquiry in a case such as this one must be: Was the accused, who waived his Sixth Amendment rights during postindictment questioning, made sufficiently aware of his right to have counsel present during the questioning, and of the possible consequences of a decision to forgo the aid of counsel? In this case, we are convinced that by admonishing petitioner with the *Miranda* warnings, respondent has met this burden and that petitioner's waiver of his right to counsel at the questioning was valid.

The Court emphasized in *Patterson* that the *Miranda* warnings provide an adequate basis for an accused to make a knowing and intelligent waiver of the Sixth Amendment right to counsel. The Court stated, *id.* at 299–300, 108 S.Ct. 2389:

> So long as the accused is made aware of the "dangers and disadvantages of self-representation" during postindictment questioning, by use of the *Miranda* warnings, his waiver of his Sixth Amendment right to counsel at such questioning is "knowing and intelligent."

In *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Supreme Court had held that the Fifth Amendment right to have counsel present during custo-

dial interrogation had been violated when the police reinitiated interrogation after the suspect had requested counsel. Because the suspect had not been indicted, the *Edwards* Court did not address whether the outcome would have been the same under the Sixth Amendment. 451 U.S. at 480–82 n. 7, 101 S.Ct. 1880. The Court stated in *Edwards,* 451 U.S. at 484–85, 101 S.Ct. 1880 (footnote omitted):

[A]lthough we have held that after initially being advised of his *Miranda* rights, the accused may himself validly waive his rights and respond to interrogation, *see North Carolina v. Butler,* [441 U.S. 369 (1979),] at 372–376[, 99 S.Ct. 1755, 60 L.Ed.2d 286], the Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

... [I]t is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel.

Similarly, in *Minnick v. Mississippi,* 498 U.S. 146, 150, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), the Court emphasized that it was not "reaching any Sixth Amendment implications in the case," but held that "the Fifth Amendment protection of *Edwards* is not terminated or suspended by consultation with counsel." The Court explained in *Minnick,* 498 U.S. at 153, 111 S.Ct. 486:

In our view, a fair reading of *Edwards* and subsequent cases demonstrates that we have interpreted the rule to bar police-initiated interrogation unless the accused has counsel

with him at the time of questioning. Whatever the ambiguities of our earlier cases on this point, we now hold that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney.

In *Montejo v. Louisiana*, 556 U.S. ——, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009), the Supreme Court expressly overruled the waiver language in *Michigan v. Jackson*, and held that the procedural safeguards announced in Fifth Amendment cases such as *Edwards* and *Minnick* were adequate to protect an accused's Sixth Amendment right to counsel. Montejo was a suspect in connection with a murder. When he was arrested, he waived his *Miranda* rights, and ultimately admitted to shooting the victim. Montejo was brought before a judge and charged with murder. The court ordered the Office of Indigent Defender to represent Montejo on the charges. After the appointment of counsel, but before Montejo had met with any attorney, the police asked him to accompany them to find the murder weapon. The police again advised him of his *Miranda* rights, and Montejo accompanied them on the excursion, during which he wrote a letter of apology to the victim's wife. Montejo's court-appointed counsel was upset that the police had talked with his client. But Montejo's letter was nevertheless admitted in evidence over defense counsel's objection.

The Supreme Court rejected Montejo's contention that, under *Michigan v. Jackson*, there was a presumption that his waiver of counsel was invalid. 129 S.Ct. at 2091. Instead, the Court held that, like most other rights, the Sixth Amendment right to assistance of counsel could be effectively waived— even by an accused already represented by counsel—"so long as the relinquishment of the right is voluntary, knowing, and intelligent. The defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled." *Id.*, 129 S.Ct. at 2085 (citations omitted) (footnote omitted). The Court noted that, generally, the *Miranda* warnings will suffice to provide the

accused with the information he needs to know in order for the waiver to be considered "a knowing and intelligent one." *Id.* (citing *Patterson, supra,* 487 U.S. at 296, 108 S.Ct. 2389). The Court held that the protections afforded by cases decided under the Fifth Amendment were sufficient to protect the accused's Sixth Amendment right to counsel, stating, 129 S.Ct. at 2089–90:

> [T]he Court has already taken substantial other, overlapping measures toward the same end. Under *Miranda's* prophylactic protection of the right against compelled self-incrimination, any suspect subject to custodial interrogation has the right to have a lawyer present if he so requests, and to be advised of that right. 384 U.S., at 474, 86 S.Ct. 1602, 16 L.Ed.2d 694. Under *Edwards'* prophylactic protection of the *Miranda* right, once such a defendant "has invoked his right to have counsel present," interrogation must stop. 451 U.S., at 484, 101 S.Ct. 1880, 68 L.Ed.2d 378. And under *Minnick's* prophylactic protection of the *Edwards* right, no subsequent interrogation may take place until counsel is present, "whether or not the accused has consulted with his attorney." *[Minnick v. Mississippi,]* 498 U.S. [146], at 153, 111 S.Ct. 486, 112 L.Ed.2d 489 [(1990)].

These three layers of prophylaxis are sufficient. Under the *Miranda–Edwards–Minnick* line of cases (which is not in doubt), a defendant who does not want to speak to the police without counsel present need only say as much when he is first approached and given the *Miranda* warnings. At that point, not only must the immediate contact end, but "badgering" by later requests is prohibited. If that regime suffices to protect the integrity of "a suspect's voluntary choice not to speak outside his lawyer's presence" before his arraignment, *Cobb,* 532 U.S., at 175, 121 S.Ct. 1335, 149 L.Ed.2d 321 (Kennedy, J., concurring), it is hard to see why it would not also suffice to protect that same choice after arraignment, when Sixth Amendment rights have attached. And if so, then *Jackson* is simply superfluous.

It is true, as Montejo points out in his supplemental brief, that the doctrine established by *Miranda* and *Edwards* is

designed to protect Fifth Amendment, not Sixth Amendment, rights. But that is irrelevant. What matters is that these cases, like *Jackson,* protect the right to have counsel during custodial interrogation—which right happens to be guaranteed (once the adversary judicial process has begun) by two sources of law. Since the right under both sources is waived using the same procedure, *Patterson, supra,* at 296, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261, doctrines ensuring voluntariness of the Fifth Amendment waiver simultaneously ensure the voluntariness of the Sixth Amendment waiver.

Despite the *Montejo* Court's rejection of *Jackson's* presumption against waiver of an accused's Sixth Amendment rights, the Court nevertheless held that Montejo should have the opportunity to argue that his waiver was invalid under the rule of *Edwards.* The Court stated:

[W]e think that Montejo should be given an opportunity to contend that his letter of apology should still have been suppressed under the rule of *Edwards.* If Montejo made a clear assertion of the right to counsel when the officers approached him about accompanying them on the excursion for the murder weapon, then no interrogation should have taken place unless Montejo initiated it. *Davis, supra,* at 459, 114 S.Ct. 2350. Even if Montejo subsequently agreed to waive his rights, that waiver would have been invalid had it followed an "unequivocal election of the right," *Cobb,* 532 U.S., at 176, 121 S.Ct. 1335, 149 L.Ed.2d 321 (Kennedy, J., concurring).

More recently, in *Maryland v. Shatzer,* 559 U.S. ——, 130 S.Ct. 1213, —— L.Ed.2d —— (2010), the Supreme Court clarified that the *Edwards* prohibition against further custodial interrogation after an accused has invoked the Fifth Amendment right to counsel is limited to a period of fourteen days. In *Shatzer,* as in *Edwards,* the Court was not considering the Sixth Amendment right to counsel of an "accused" because Shatzer had not been charged with the crime about which he was being questioned by police. The Court explained its reasoning for arbitrarily choosing a period of

fourteen days as follows: "That provides plenty of time for the suspect to get reacclimated to his normal life, to consult with friends and counsel, and to shake off any residual coercive effects of his prior custody." 559 U.S. at ——, 130 S.Ct. at 1223. The Court noted, 559 U.S. at ——, 130 S.Ct. at 1223, that, after the expiration of fourteen days, the State would still bear the burden of demonstrating that there was a valid waiver of the defendant's *Miranda* rights under the voluntary and knowing standard of *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

We assume that the fourteen-day limit announced in *Shatzer* with respect to subsequent interrogations of a suspect who has not been charged has no application to an accused who is incarcerated while awaiting trial. But, even if *Shatzer* could be read to suggest that police can approach an accused who is in pretrial custody every fourteen days, neither *Shatzer* nor *Montejo* eliminated the requirement that fresh *Miranda* warnings be given to a suspect who had previously invoked the right to counsel. The Court noted in *Shatzer,* 130 S.Ct. at 1223 n. 7:

> A defendant who experiences a 14–day break in custody after invoking the *Miranda* right to counsel is not left without protection. *Edwards* establishes a *presumption* that a suspect's waiver of *Miranda* rights is involuntary. *See Arizona v. Roberson,* 486 U.S. 675, 681, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). Even without this "second layer of prophylaxis," *McNeil v. Wisconsin,* 501 U.S. 171, 176, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991), a defendant is still free to claim the prophylactic protection of *Miranda*—arguing that his waiver of *Miranda* rights was in fact involuntary under *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). *See Miranda,* 384 U.S., at 475, 86 S.Ct. 1602, 16 L.Ed.2d 694.

In Adams's case, there clearly were no *Miranda* warnings given when the detectives met with Adams at the detention center on November 29, 2006. As Detective Blankenship conceded at the suppression hearing: "He was not [M]irandized nor was he given any kind of warning." Consequently,

there is no basis for finding that there was an intentional, knowing, and intelligent waiver of Adams's right to have his counsel of record serve as the medium for communications with the police and prosecutor.

The State urges us to find that there was no interrogation and that Adams's statement was an unanticipated blurt. The undisputed facts simply do not support that view.

When Detective Blankenship went to the detention center, he was ostensibly fulfilling the State's duty under Criminal Law Article, § 2–203, to notify Adams that the State would seek a life sentence at trial, notwithstanding the fact that the State had already served Adams's attorney with notice of that intent. The State's Attorney's Office for Washington County represented that it is that office's practice to make personal service of the notice upon the defendant even if the defendant is represented by counsel.[3]

---

**3.** The importance of communicating with represented parties through counsel is underscored by Rule 4.2 of the Maryland Lawyers' Rules of Professional Conduct ("MRPC"), which admonishes attorneys that: "[A] lawyer shall not communicate about the subject of the representation with a person who the lawyer knows is represented in the matter by another lawyer unless the lawyer has the consent of the other lawyer or is authorized by law or court order to do so." MRPC Rule 3.8 addresses "Special Responsibilities of a Prosecutor," and admonishes that a "prosecutor in a criminal case shall:

 (b) make reasonable efforts to assure that the accused has been advised of the right to, and the procedure for obtaining, counsel and has been given reasonable opportunity to obtain counsel; [and] (c) not seek to obtain from an unrepresented accused a waiver of important pretrial rights, such as the right to a preliminary hearing."

But, although prosecutors (like all lawyers in this State) have a professional responsibility to comply with all applicable rules of professional conduct, and to make reasonable efforts to assure that the conduct of their employees and agents is "compatible with the professional obligations of the lawyer," MRPC Rule 5.3, the Supreme Court has observed that the violation of a state's ethical rules is not determinative of whether a right guaranteed by the Constitution has been violated. In *Texas v. Cobb*, 532 U.S. 162, 172 n. 2, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001), the Court stated: "Such standards are obviously not controlling in interpretation of constitutional provisions." *Accord Montejo, supra*, 556 U.S. at ——, 129 S.Ct. at 2087. *But cf. Maine v. Moulton, supra*, 474 U.S. at 171, 106 S.Ct. 477 ("We have ... made clear that, at the very least, the prosecutor and police have an affirma-

Although it is clear that oral notice is insufficient, *Gorge v. State,* 386 Md. 600, 613, 873 A.2d 1171 (2005), and timely notice is essential, *Hammersla v. State,* 184 Md.App. 295, 313, 965 A.2d 912 (2009), the discussion in *Whittlesey v. State,* 340 Md. 30, 83, 665 A.2d 223 (1995), suggests that service upon counsel of record in accordance with Maryland Rule 1–321(a) would satisfy the statutory notice requirement. With respect to the similarly required written notice of intent to seek the death penalty, the Court of Appeals held in *Whittlesey, id.*: "When a defendant is represented by counsel, service of the notice to seek the death penalty is properly made upon the attorney."

In *Gorge, supra,* 386 Md. at 619–20, 873 A.2d 1171, the Court of Appeals suggested two alternatives for complying with the notice requirement of Criminal Law Article, § 2–203, neither of which required sending a member of the investigative team to the detention center where the defendant was being held:

> In a case involving a sentence as serious as life without the possibility of parole, it is entirely reasonable to require the State to follow the letter of the law. We suggest that in order to avoid a problem in the future, the State should prepare and send a written notice with a signed certificate of mailing or service, file it with the court, and retain a copy of it in the State's own file. Alternatively, the State could present the defendant with the written notice in open court, (at least 30 days before trial), and state on the record that the notice has been handed to the defendant. If either of those methods are used, there will be no question regarding whether the State provided the written notice required by the statute.

Despite the purportedly limited purpose for the detectives to meet with Adams on November 29, 2006, Detective Blankenship did not merely hand over the documents and tell Adams to contact his attorney for further explanation. In-

tive obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel.").

stead, the detectives accompanied Adams to a private room and remained with him while he reviewed the notice of the State's intent to seek an enhanced penalty. Detective Blankenship explained: "I wanted to be there to answer questions for him."

When Adams became visibly upset and questioned the severity of the sentence now being sought, the detectives could have simply instructed him to talk with his attorney. Instead, Detective Blankenship confronted him with a statement accusing him of stabbing the victim 32 times. In view of the circumstances surrounding the encounter and Detective Blankenship's prior relationship with Adams, the detectives should have known that this accusatory statement was likely to elicit a response from Adams. Indeed, Detective Blankenship's explanation for the presence of the second detective— that she was present to witness any incriminating blurt-outs— indicates that the detectives anticipated that an incriminating response was reasonably likely. When Adams began to make substantive statements in response to Detective Blankenship's accusation, neither detective made any attempt to put a stop to the conversation. Neither detective made any effort to remind Adams of the rights summarized in the *Miranda* warnings.

Writing for this Court in *Prioleau v. State*, 179 Md.App. 19, 27, 943 A.2d 696 (2008), Judge Mary Ellen Barbera explained that "police interrogation" need not involve express questioning:

> Interrogation, for *Miranda* purposes, is not limited to "police interrogation practices that involve express questioning[.]" *Rhode Island v. Innis*, 446 U.S. 291, 298–99, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The Supreme Court recognized in *Innis* that such an approach to interrogation would be inconsistent with the concern in *Miranda* about the use by law enforcement personnel of various "psychological ploys" in custodial settings. *Id.* at 299, 100 S.Ct. 1682. The Court concluded, therefore, that "the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional

equivalent." *Id.* at 300–01, 100 S.Ct. 1682. The Court explained what it meant by the "functional equivalent" of interrogation: [T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. *Id.* at 301, 100 S.Ct. 1682 (footnotes omitted).

In *Prioleau, supra,* 411 Md. at 651, 984 A.2d 851, the Court of Appeals affirmed this Court's conclusion that, under the circumstances, asking "what's up?" was not the functional equivalent of interrogation. The Court of Appeals concluded, after analyzing the totality of the circumstances, that the arresting officer who asked "What's up, Maurice?" should not have reasonably expected that that statement was likely to elicit an incriminating response. The Court explained:

> Reviewing the evidence in the light most favorable to the prevailing party, it is clear that the suppression hearing court found that Detective Stach did not intend to ask Petitioner "a question on anything that has to do with illegal activity." That factual finding was not clearly erroneous. The critical inquiry, therefore, is whether Detective Stach, based on the totality of the circumstances, knew or should have known that greeting Petitioner with the words, "What's up, Maurice?," would be reasonably likely to elicit an incriminating response. From our own independent constitutional appraisal of the record, we hold that it is not reasonable to expect that those words would be likely to elicit an incriminating response.

Our independent constitutional appraisal of the totality of circumstances in Adams's case leads us to the opposite conclusion. This was not a chance encounter with the accused. Nor was the discussion initiated by the accused. Nor was Adams's incriminating statement blurted out during an exchange of pleasantries. Here, the lead detective in the case, who had known Adams since Adams was a child, arranged for the defendant to be taken from his cell to a more "comfortable"

area of the detention center. The detective sat down at a table with Adams as if to begin a conference. The detective handed Adams documents specifically dealing with this case, and told the defendant to read the documents in the presence of the two officers. The detective acknowledged that it was his intent to talk with Adams about substantive legal issues: "I wanted to be there to answer questions for him." When Adams asked the detective a question about the State's approach to the case ("Why are they coming after me for this so hard?"), the detective did not simply refer Adams to his own attorney of record. Instead, the detective confronted the defendant with an accusatory statement that contradicted the story Adams had told the detective during their previous interview.

Under the totality of the circumstances, our independent appraisal leads us to conclude that any reasonable police officer could have reasonably anticipated that Adams would respond to the substance of Blankenship's accusation, and that the response could be incriminating. Consequently, regardless of whether the detective acted in good faith in initiating this meeting outside the presence of Adams's counsel, this encounter was the functional equivalent of interrogation. *Blake v. State,* 381 Md. 218, 236, 849 A.2d 410 (2004) ("Actions taken by the police that the police should know are reasonably likely to elicit an incriminating response from a suspect amount to the functional equivalent of interrogation."). In the absence of any basis for finding a knowing and intelligent waiver of Adams's right to be represented by counsel during such pretrial encounters, the statement should have been suppressed.

■ But, even though we hold that the statement should not have been admitted during the State's case in chief, the statement would be admissible for impeachment purposes if Adams were to testify. As the Supreme Court stated in *Kansas v. Ventris,* 556 U.S. ——, 129 S.Ct. 1841, 1846, 173 L.Ed.2d 801 (2009), "the *Massiah* right is a right to be free of

uncounseled interrogation, and is infringed at the time of the interrogation." The Court noted:

> We have held in every other context that tainted evidence—evidence whose very introduction does not constitute the constitutional violation, but whose obtaining was constitutionally invalid—is admissible for impeachment. We see no distinction that would alter the balance here.
>
> We hold that the informant's testimony, concededly elicited in violation of the Sixth Amendment, was admissible to challenge Ventris's inconsistent testimony at trial.

129 S.Ct. at 1847 (citations omitted) (footnote omitted).

 Although we conclude that the circuit court erred in declining to suppress Adams's second statement during the State's case in chief, our analysis does not end there. We next ask whether the error was harmless. *See Arizona v. Fulminante,* 499 U.S. 279, 311, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (observing that a confession obtained in violation of the Sixth Amendment is a "trial error" subject to harmless error analysis). The Court of Appeals in *Blanks v. State,* 406 Md. 526, 543, 959 A.2d 1180 (2008) (quoting *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976)), described the standard for determining whether an error is "harmless":

> "[W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and a reversal is mandated."

Detective Blankenship testified at trial that, after Adams asked why the State was coming after him so hard, he replied, "Well, Marshall, you stabbed the guy 32 times." He then testified as follows about Adams's response to that assertion:

> Q. [BY THE PROSECUTOR] And after you said "Well Marshall you stabbed him 32 times", what did he say?
>
> A. Well he, he corrected me and said "I didn't stab him 32 times, I only stabbed him seven times."

\* \* \*

Q. Did he end with "I only stabbed him seven times"?

A. No he started to go through the seven stab wounds that he inflicted.

\* \* \*

Q. What can you remember from that interview that he told you?

A. Well he specifically said that there was one stab wound to the victim's neck. There was one stab wound to his back. There was an additional stab wound to his finger. And I can't recall what the other stab wounds were.

Q. Did he at that time give you a location for each of the seven?

A. Yes he did. I think he actually pointed on his body where they were too.

Adams's statement to Detective Blankenship, describing in detail the seven wounds he admitted inflicting upon Morris, contradicted his initial statement contending that he "blacked out" and could not remember the details of the skirmish. The admission of the later statement undermined Adams's proffered defense that he was not guilty of murder because he suffered from post-traumatic stress disorder, which had caused him to black out during the combat with Morris. The psychologist who testified for the defense conceded that Adams's description of seven stab wounds was not consistent with having blacked out due to post-traumatic stress disorder. Accordingly, we cannot say that the admission in evidence of statement made to Detective Blankenship on November 29, 2006, was harmless beyond a reasonable doubt.

Because the other two issues raised on appeal are likely to arise again upon retrial, we will also address them.

## II. Jury Instruction

■ Adams requested that the court give a jury instruction on hot blooded response to legally adequate provocation, specifically, Maryland Criminal Pattern Jury Instruction

4:17.4 C (2006). The court declined, explaining that, in the court's view, the evidence was not sufficient to support such an instruction.[4]

---

**4.** MPJI–Cr 4:17.4 C provides the following pattern instruction on hot blooded response:

Voluntary manslaughter is an intentional killing, which would be murder, but is not murder because the defendant acted in hot blooded response to legally adequate provocation. This does not result in a verdict of not guilty, but rather reduces the level of guilt from murder to manslaughter.

You have heard evidence that the defendant killed *(victim)* in hot blooded response to legally adequate provocation. In order to convict the defendant of murder, the State must prove that the defendant did not act in hot blooded response to legally adequate provocation. If the defendant did act in hot blooded response to legally adequate provocation, the verdict should be guilty of voluntary manslaughter and not guilty of murder.

Killing in hot blooded response to legally adequate provocation is a mitigating circumstance. In order for this mitigating circumstance to exist in this case, the following five factors must be present:
(1) the defendant reacted to something in a hot blooded rage, that is, the defendant actually became enraged:
(2) the rage was caused by something the law recognizes as legally adequate provocation, that is, something that would cause a reasonable person to become enraged enough to kill or inflict serious bodily harm. The only act that you can find to be adequate provocation under the evidence in this case is [a battery by the victim upon the defendant] [a fight between the victim and the defendant] [an unlawful warrantless arrest of the defendant by the victim, which the defendant knew or reasonably believed was unlawful];
(3) the defendant was still enraged when [he] [she] killed the victim, that is, the defendant's rage had not cooled by the time of the killing;
(4) there was not enough time between the provocation and the killing for a reasonable person's rage to cool; and
(5) the victim was the person who provoked the rage.

In order to convict the defendant of murder, the State must prove that the mitigating circumstance of hot blooded provocation was not present in this case. This means that the State must persuade you, beyond a reasonable doubt, that at least one of the five factors was absent. If the State has failed to persuade you that at least one of the five factors was absent, you cannot find the defendant guilty of murder, but may find the defendant guilty of voluntary manslaughter.

In order to convict the defendant of murder, the State must prove that the defendant did not act in hot blooded response to legally adequate provocation. If the defendant did act in hot blooded response to legally adequate provocation, the verdict should be guilty of voluntary manslaughter and not guilty of murder.

In *Christian v. State*, 405 Md. 306, 322–23, 951 A.2d 832 (2008), the Court of Appeals summarized cases in which the Court had recognized the mitigating factor of hot blooded response, stating:

The first defense, commonly referred to as hot-blooded response to legally adequate provocation, typically involves passion-creating circumstances, those that provoke action, and therefore, those to which the rule of provocation applies. *Girouard v. State*, 321 Md. 532, 538, 583 A.2d 718, 721 (1991). *See also State v. Faulkner*, 301 Md. 482, 486, 483 A.2d 759, 761 (1984). In *Girouard*, we stated the test for determining when the defense of provocation may apply as follows:

"1. There must have been adequate provocation;

2. The killing must have been in the heat of passion;

3. It must have been a sudden heat of passion—that is, the killing must have followed the provocation before there had been a reasonable opportunity for the passion to cool;

4. There must have been a causal connection between the provocation, the passion, and the fatal act."

*Girouard*, 321 Md. at 539, 583 A.2d at 721. We have recognized that the defense may be raised in cases involving mutual affray, assault and battery, discovering one's spouse in the act of sexual intercourse with another, resisting an illegal arrest, witnessing, or being aware of, an act causing injury to a relative or a third party, and anything the natural tendency of which is to produce passion in ordinary men and women. *Id.* at 538, 583 A.2d at 721. *See also Faulkner*, 301 Md. at 486, 483 A.2d at 761–62; *Glenn v. State*, 68 Md.App. 379, 403–04, 511 A.2d 1110, 1123, *cert. denied*, 307 Md. 599, 516 A.2d 569 (1986); 1 RONALD A. ANDERSON, WHARTON'S CRIMINAL LAW AND PROCEDURE § 276 (1957).

■ One possible source of adequate provocation is mutual combat. As the Court of Appeals stated in *Sims v. State*, 319 Md. 540, 551–52, 573 A.2d 1317 (1990):

Mutual combat has been recognized as a possible source of adequate provocation. *Carter v. State,* 66 Md.App. 567, 572, 505 A.2d 545 (1986); *Shuck v. State,* 29 Md.App. 33, 38–40, 349 A.2d 378 (1975), *cert. denied,* 278 Md. 735 (1976); *Whitehead v. State, supra,* 9 Md.App. [7] at 11, 262 A.2d 316 [(1970)]; R. Perkins and R. Boyce, *Criminal Law* 88–91 (3d ed. 1982); 2 C. Torcia, *Wharton's Criminal Law* § 159 (14th ed. 1979). The rule of provocation will apply when persons enter into angry and unlawful combat with a mutual intent to fight and, as a result of the effect of the combat, the passion of one of the participants is suddenly elevated to the point where he resorts to the use of deadly force to kill the other solely because of an impulsive response to the passion and without time to consider the consequences of his actions.

In *Dykes v. State,* 319 Md. 206, 216–17, 571 A.2d 1251 (1990), the Court explained that the defendant need only be able to show that there is "some" evidence to support the mitigation instruction. The Court stated:

> *Some evidence* is not strictured by the test of a specific standard. It calls for no more than what it says—"some," as that word is understood in common, everyday usage. It need not rise to the level of "beyond reasonable doubt" or "clear and convincing" or "preponderance." The source of the evidence is immaterial; it may emanate solely from the defendant. It is of no matter that the self-defense claim is overwhelmed by evidence to the contrary. If there is any evidence relied on by the defendant which, if believed, would support his claim that he acted in self-defense, the defendant has met his burden. Then the baton is passed to the State. It must shoulder the burden of proving beyond a reasonable doubt to the satisfaction of the jury that the defendant did not kill in self-defense.

Furthermore, the Court of Appeals made plain in *Sims, supra,* 319 Md. at 550, 573 A.2d 1317, that a defendant is entitled to "simultaneously advance inconsistent theories of defense." The Court held, *id.:* "We hold that a defendant is entitled to have the jury instructed on any theory of defense

that is fairly supported by the evidence, even if several theories offered are inconsistent."

In this case, we conclude that Adams met the minimal burden of showing that there was "some" evidence in the record to support a potential finding that he reacted in a hot blooded response to a surprising robbery attempt by Leo Morris, who—according to Adams's statement that was admitted in evidence—pulled a knife on Adams, demanded the drugs from Adams, and made an aggressive move toward Adams, which led to mutual combat. To paraphrase the Court of Appeals's statement in *Dykes*, it is of no matter that the claim of hot blooded response is overwhelmed by evidence to the contrary. Because there was some evidence in the record which, if believed, would support Adams's claim that he acted in hot blooded response to legally adequate provocation, the defendant was entitled to the requested instruction.

### III. Expert Testimony

■ Adams contends that the trial court erred in permitting one of the State's expert witnesses to express an opinion. Jeffrey Kercheval testified that he is "the supervisory forensic scientist at the Western Maryland Regional Crime Laboratory located at the Hagerstown Police Department...." He said that, in addition to examining crime scenes, he is sometimes "asked to try to reconstruct portions of the crime scene that might have occurred." Mr. Kercheval explained:

> Basically crime scene reconstruction is using the scientific method and with logical thinking or logical reasoning, applying that to the crime scene environment, the physical evidence that is present at the crime scene environment and that physical evidence is tangible objects—things you can see, touch or feel, smell, things that respond to your senses, in addition to relevant and pertinent information about the case, to come to the most probable sequence of events which would have occurred in a particular crime scene location.

When the State offered Mr. Kercheval "as an expert in crime scene reconstruction," defense counsel asked no voir

dire questions, and told the court: "I think we'll accept Mr. Kercheval." Whereupon, the court ruled that "Mr. Kercheval will be accepted as an expert in the field of crime scene reconstruction."

Among the opinions Mr. Kercheval expressed about the sequence of events that took place on the night of the crime was an opinion that Morris's right hand, which had been cut while it was in his pocket, was probably injured early in the encounter. He testified:

> When I look at Mr. Morris's clothing and the injury to his right hand, the hand was in the right pocket, the pocket was cut through in this location towards the front of the jacket. There were perforations in the back side of the pocket. The fingers were protruding from that uh tear or cut in the uh in the pocket and were kind of intertwined with the fabric.

> \* \* \*

> That hand was so intertwined that we were afraid to take the coat off. In looking at the autopsy report and evaluating the autopsy report in conjunction with the clothing and uh the obvious trauma to Mr. Morris's hand in this particular situation and applying human nature and noticing that if we take a look at the autopsy report we see I believe six cutting wounds to the left hand or left arm of Mr. Morris which the medical examiner characterized as uh consistent with defense wounds. And anytime we see wounds on the hands or in the arms of an individual who is a victim in a case, they can be generally characterized as defense wounds, trying to ward off blows or protect yourself.

> On the right hand or the right arm and right hand what we see is we have this cut through the pocket, we have perforations through the back of the pocket, we have the fingers intertwined with the material and we don't have a lot of cutting or stabbing wounds present on the right arm. Which suggested to me that the left arm was being used to ward off blows or to try to defend Mr. Morris while the right hand was incapacitated. Which would also suggest

that the right hand wounding occurred rather early in the confrontation.

At that point, defense counsel lodged her only objection, stating: "We object to that [Y]our Honor. That's conjecture at this point." The court responded: "He's been qualified. This is his opinion. You will certainly be able to cross-examine him on it."

On appeal, the appellant says little more, arguing that the testimony about timing of the wound "was incompetent. There was no factual basis or foundation from which he could have formed this opinion." Appellant cites no authority to support his trial contention that the expert had engaged in impermissible conjecture. We perceive no abuse of discretion in the trial court's ruling.

**THE JUDGMENT OF THE CIRCUIT COURT FOR WASHINGTON COUNTY IS VACATED, AND THE CASE IS REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY WASHINGTON COUNTY.**